UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v

PAMELA J. GROOTERS,

    Defendant.
_____/

Case No.  1:07-CR-001

HON. JANET T. NEFF

### SENTENCING MEMORANDUM

On December 10, 2007, defendant Pamela J. Grooters entered a plea of guilty to one count of possession of stolen mail, 18 U.S.C. § 1708, and one count of unauthorized access of a protected computer with intent to defraud, 18 U.S.C. § 1030(a)(4), pursuant to a plea agreement with the Government (Counts 1 and 2, respectively, of the Superseding Felony Information).  On June 12, 2008, after a lengthy hearing, the Court sentenced defendant to five years probation with special conditions of mental health treatment, counseling, oversight, and $210,227.06 in restitution.

In this highly unusual case, the Court is charged with rendering a just conclusion by means of sentencing, considering the circumstances of the offense and the offender.  Pursuant to federal statutory mandates, the Court must ultimately "impose a sentence sufficient, but not greater than necessary" to accomplish the goals of sentencing.  18 U.S.C. § 3553(a)(2); *Kimbrough v. United States,* 128 S. Ct. 558, 570 (2007).  After much deliberation, the Court has determined that the

sentence imposed accomplishes those goals. This memorandum sets forth the Court's specific reasoning for that determination.

## I.  Background and Facts

This case represents a departure from the norm in all respects. Before the Court is a 41-year-old defendant, Pamela Grooters, a former federal probation officer and former Federal Public Defender's office employee, who has no prior criminal history, but now stands convicted of the federal crimes of possession of stolen mail and unauthorized access of a protected computer with intent to defraud (Presentence Investigation Report (PSR) p. 12). Defendant is well-educated, a wife and mother who has devoted the greater part of her life to her family, her education, and her career pursuits.

Defendant graduated from Calvin College in Grand Rapids, Michigan, with a Bachelor's Degree in criminal justice and psychology in 1990, with a 3.86 grade point average (GPA). She earned a Master of Arts degree in counselor education and counseling psychology from Western Michigan University, graduating in 1995 with a 4.0 GPA. In 1995, she became a licensed counselor (Professional Counselor-Education Limited License). Her license remained valid in 2008. [PSR ¶¶ 63-65.]

From 1996 to 2001, defendant was employed at Pathfinder Resources, a residential substance abuse treatment program. She worked in various capacities, including therapist, site coordinator, site manager, clinician, and director of clinical case management. From 1997 to 1999, defendant was employed as a United States Probation Officer for the U.S. District Court, Western District of Michigan. The following year, from 2001 to 2002, she was employed by the Federal Public Defender's office in Grand Rapids as an investigator. [PSR ¶¶ 68-70.] Although defendant

previously worked in government-related positions associated with the justice system, it is of special note that this Court, and this judge in particular, has had no prior contact with the defendant and has no connection with her in her capacity as a government employee or otherwise.

Defendant is married to Gregg Grooters, and the couple have two children, a 17-year-old daughter who will be attending Central Michigan University in the fall, and an 11-year-old son. Until her involvement in the present ordeal, defendant's life was unremarkable from the standpoint of the legal system. She had no history of alcohol or other substance abuse and no history of encounters with the law. [PSR ¶¶ 51, 59.]

Defendant's downward spiral into criminal activity began sometime in 2002 after she had treated for a series of medical problems, beginning with an ankle injury playing softball in 1997. The ankle failed to heal properly following surgery, which was complicated by her obesity. In 2000, she underwent gastric bypass surgery, after which she suffered from malabsorption and malnutrition resulting in severe anemia. To combat pain from her ankle injury, defendant began taking Vicodin, and later, fearing dependency on Vicodin, she sought alternative pain management in November 2001 through Dr. Lawrence Probes, a psychiatrist. Defendant subsequently suffered a host of other medical problems. It was during her treatment with Dr. Probes in 2002 and 2003 that defendant was prescribed an extensive prescription drug regimen, at one point consisting of approximately 15 medications, including methadone (for pain), benzodiazepines, and Ritalin (to combat being drowsy with the methadone). [PSR ¶¶ 12-13; Mary J. Clark Rep. p. 1]

During this same time, defendant embarked on a joint business venture with a friend, Paula Strabbing, also a gastric-bypass patient, to start a counseling business. The two began joint financial undertakings for the business. Based on defendant's representation that she was securing a small

business grant of one million dollars, Strabbing secured several personal loans and credit cards for the business with the understanding that these debts would be repaid with money from the grant. However, defendant did not secure grant money to start the business. Instead, sometime in late-2002 to late-2003, she became immersed in an assortment of questionable behavior and activities ranging from the bizarre to criminal, including impersonation, stealing mail and hoarding advertising flyers, unauthorized credit card use, and accessing others' bank accounts. [PSR pp. 5-6] Over a period of approximately one year, defendant's behavior transformed from unremarkable to incredible. Not coincidentally, her bizarre personal conduct coincided with her intense drug regimen prescribed by Dr. Probes.

In late 2002, defendant convinced Strabbing, her business partner that they had been the victims of identity theft and that the Federal Bureau of Investigation (FBI) was investigating the matter. On the pretense of the investigation, defendant instructed Strabbing not to open any mail or bills from credit card companies, and to place them in plastic bags, which defendant would turn over to the FBI as evidence. During this time, defendant opened approximately 11 credit cards in the name of Strabbing and her husband without their knowledge. Defendant used the loans and credit cards obtained by Strabbing for primarily non-business related expenses. The unauthorized purchases totaled $192,512.83. [PSR p. 6]

In early 2003, defendant began stealing mail from mailboxes in Grand Rapids and surrounding areas. In May 2003, she mixed mail between curbside mailboxes at a condominium complex and left a note for one resident, in which defendant identified herself as "Sue Portman" and stated that she had mistakenly received the resident's mail. In subsequent weeks, defendant contacted the resident many times by phone or in person on the pretense of returning mistakenly

received mail. In one contact, defendant claimed to work for the Justice Department and stated that she was also a victim of identity theft, in addition to relating several other bizarre circumstances. Defendant secured personal information from the resident, who later discovered that she had not received several credit card statements, a replacement credit card, and an Internal Revenue Service check. Defendant used the stolen replacement card to make fraudulent purchases of $3,320.92. [PSR p. 6]

In 2003, defendant also used information gained from her employment with the Federal Public Defender's office to undertake some of these activities. In her capacity as an investigator for the Federal Public Defender's office, defendant was given the account number of a coworker (while awaiting her own account) to access Choicepoint databases, including Faces of the Nation, which is unavailable to the public. Between April 4, 2003 and August 8, 2003, she used the account of her former co-worker to access Faces of the Nation on 40 occasions. Defendant obtained personal identifying information on other individuals, including addresses and social security numbers, which she used to steal mail, open credit cards accounts, and access bank accounts of others. [PSR p. 5]

During June, July, and August 2003, residents in a Cascade neighborhood reported missing mail and fraudulent activities involving bank accounts and credit cards. On July 18, 2003, a postal customer observed defendant looking in mailboxes. A postal investigator responded to the scene and observed defendant stopping at several mailboxes. She was apprehended, and in her vehicle, authorities found 110 pieces of stolen mail, an insurance check for $700.00, an altered temporary driver's license, credit card applications, and a U.S. Treasury check for $2,540. There were also eight Faces of the Nation printouts containing identifying information for persons whose mail she

5

had stolen. Authorities also found another check payable to defendant's dentist, whose practice was in the same building where defendant rented space. She also had seven bank cards, which were later found to have unauthorized purchases of $14,393.31. [PSR p. 6]

Subsequent investigation revealed a wide assortment of unauthorized transactions by defendant relating to credit card accounts of the mail theft victims, including electronic checks, credit card payments, hotel reservations that were not used, and purchases at Wal-Mart and Meijer on multiple occasions. [PSR p. 7] In July 2003, defendant used a bank account of her dentist to make payments of $7,000 and $4,000 on her credit card accounts. Defendant made a third payment in the same month from the dentist's account on a Fleet credit card account belonging to Strabbing. The Fleet card was recovered from defendant on July 18, 2003, but on July 20, 2003, she reported the card lost and new cards were issued to her address. [PSR p. 7]

When defendant was interviewed by Postal Inspection agents and the FBI in August 2003, she denied any fraudulent activities and attributed the appearance of such activities to theft of her identity. Nevertheless, even after the interview, she continued with the unauthorized transactions through December 2003. She applied for a Wal-Mart credit card using the name of Jean P. Groters-Steele and the social security number of a different person. The total fraudulent charges from defendant's activities amounted to $210,227.06 relating to 10 individuals and 18 financial institutions. [PSR pp. 7-8]

During the time of the mail theft, unauthorized computer account use, and assortment of unauthorized financial transactions, defendant engaged in a wide variety of other bizarre activities and conduct. According to her husband, she was sometimes "almost catatonic," but more often paranoid and manic. He spent many nights looking for her and would find her asleep in the car in

a store parking lot, in various hotels, and just driving around, with no rational explanation. [Gregory L. Grooters Ltr. p. 1] Recognizing her serious physical and mental decline at Christmas 2002, and her increasingly "erratic, unpredictable and bizarre" behavior, Grooters' extended family (siblings and mother) petitioned the court for a competency evaluation (Valeri Jean Shafer Ltr 2; Deborah J. Haagsma Ltr 2). As a result, defendant was hospitalized for observation, but was subsequently released on the order of Dr. Probes.

On January 4, 2007, defendant was named in a three-count felony information charging her with bank fraud, 18 U.S.C. § 1344(1) and 18 U.S.C. § 20, possession of stolen mail, and unauthorized access to files of a computer, as noted above. Pursuant to a plea agreement, defendant pleaded guilty to possession of stolen mail, and unauthorized access to files of a computer. The bank fraud charge was dismissed.

## II.  Applicable Law

The Sentencing Guidelines are the "starting point and the initial benchmark" for federal sentencing. *Gall v. United States,* 128 S. Ct. 586, 596 (2007); *United States v. Thompson,* 515 F.3d 556, 561 (6th Cir. 2008). "[A]fter giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall,* 128 S. Ct. at 596; see also *United States v. Moon,* 513 F.3d 527, 538 (6th Cir. 2008). The district court must make an individualized assessment based on the facts presented and adequately explain its choice. *Gall,* 128 S.Ct. at 597; *Moon,* 513 F.3d at 538. If the court decides that an outside-Guidelines sentence is warranted, it must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. *Gall,* 128 S. Ct. at 597. The court must ultimately

"impose a sentence sufficient, but not greater than necessary," to accomplish the goals of sentencing, including "to reflect the seriousness of the offense," "to promote respect for the law," "to provide just punishment for the offense," "to afford adequate deterrence to criminal conduct," and "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2); *Kimbrough v. United States,* 128 S. Ct. 558, 570 (2007).

### III. Analysis

In this case, the recommended advisory guideline range was based on an Offense Level of 23 and a Criminal History category of I, based on zero criminal history points, resulting in a guideline range of 46 to 57 months imprisonment on each count. After considering the unusual circumstances of this case, the probation officer recommended a variance from the determined range, for a sentence of 24 months imprisonment on each count, to be served concurrently.

#### A. Objections to Sentencing Calculations

Defendant objected to the scoring of the guidelines on four grounds. First, she objected to the two-level increase for abuse of position of trust, United States Sentencing Guidelines (U.S.S.G.) § 3B1.3. She argued that the increase should not be applied because it was based on her abuse of trust as an employee of the Federal Public Defender's office and the unauthorized use of the computer password; however, the Federal Public Defender's office was not the victim of her conduct. Citing *United States v Moored,* 997 F.2d 139 (6th Cir, 1993), defendant asserted that the defendant must occupy a position of trust with the victim of the offense, not a third party, to warrant the enhancement.

Although the Court finds the question of abuse of trust a close call, the Court concurs with the government that the scoring is applicable in this case. Viewing the overall conduct at issue,

8

defendant's use of the computer password and access to the database compromised the Federal Public Defender's office security and was a breach of her former employer's trust. In that sense, the Federal Public Defender's office was a victim of defendant's conduct. Further, the requirement that the defendant be in a position to exercise discretion is met. Defendant had discretion to determine when, how, and upon which individuals to seek information from the database. Accordingly the two-level increase for abuse of trust is proper.

Defendant's second objection to the scoring was based on the scoring for the number of victims and the amount of the loss. The Probation Department's scoring included a four-level increase under U.S.S.G. § 2B1.1(b)(2)(B), "50 or more victims." This increase was based on counting the 18 financial institution victims related to the bank fraud and 47 victims of mail theft, pursuant to the rules of relevant conduct, U.S.S.G. § 1B1.3(a)(2). Further, defendant objected to a 12-level increase for a loss of more than $200,000, but less than $400,000, under U.S.S.G. § 2B1.1(b)(1)(G), which was based on the $192,512.83 loss associated with the bank fraud in addition to the $17,714.23 associated with the mail theft and other activity, for a total loss of $210,227.06.

Defendant argued that the bank fraud conduct should not be included as relevant conduct because it could not be considered (1) part of the same course of conduct, or (2) a common scheme or plan under U.S.S.G. § 1B1.3(a)(2). Defendant further argued that there should be no enhancement based on the dismissed bank fraud charge because that would render defendant's plea bargain illusory. Defendant argued that the Sixth Circuit Court of Appeals has recognized an inherent unfairness in a relevant conduct determination that effectively nullifies a plea agreement by imposing the same sentence that the defendant would have received without the plea bargain.

9

*United States v. Hill,* 79 F.3d 1477 (6th Cir. 1996). That is, such a result essentially renders the plea bargain illusory, which raises constitutional issues. In effect, defendant would be sentenced as if she pleaded guilty to the most serious of the original three counts.

The government opposed any adjustment to the enhancement for the number of victims or the amount of loss. The government concurred with the Probation Department's position that the bank fraud conduct was part of an ongoing series of offenses because defendant, through various means, obtained identifying information of numerous individuals and used it to her benefit. Moreover, the bank fraud was a direct result of the mail fraud and the unauthorized computer use. The Government noted that there was a common victim and a common modus operandi, both factors in determining whether conduct is relevant.

The Court has carefully considered whether the bank fraud conduct is a proper basis for sentence enhancement in this case, in terms of the number of victims or the amount of loss. The Court concludes that the bank fraud conduct is not relevant for the reasons cited by defense counsel, and particularly because the basis for culpability with respect to this charge is extremely tenuous.

First, as a result of the plea bargain, the government relinquished the right to prosecute the bank fraud charge, a 30-year felony, and, in exchange, defendant gave up her right to an insanity defense. As discussed subsequently, with respect to the § 3553(a) factors, there is overwhelming evidence in this case that defendant was not mentally sound at the time she engaged in the conduct underlying the bank fraud charge. Whatever direct factual relevance the bank fraud conduct may have, it must be considered in the overall context of the conduct at issue.

The plea bargain in this case secured major concessions by both the government and defendant. There is no argument that the plea bargain was in some way defective or did not

accomplish the benefits intended for both sides. And there is no question that under the terms of the plea agreement, the Court may, in its discretion, consider any circumstances of the bank fraud conduct. But the Court is not bound to do so. In the Court's view, for the government to now argue that the penalty imposed in sentencing should incorporate the underlying bank fraud conduct hardly carries out the benefit of any bargain with defendant. Under the factual circumstances of this case, this result would effectively render the plea bargain illusory.

Further, the Court has reviewed the extensive medical reports in this case, including a comprehensive and detailed psychological evaluation of defendant by Dr. Jeffrey T. Kieliszewski, Ph.D. The report was conducted for forensic purposes. Dr. Kieliszewski's report leaves no doubt in the Court's mind that defendant suffered from seriously diminished mental capacity due to the improvident, if not toxic, effects of the combined prescription drugs ordered by Dr. Probes as a pain management regimen for defendant. The record, taken as a whole, leads to no other conclusion.

It is the Court's prerogative, indeed its obligation, to determine the relevance of the particular conduct at issue for purposes of sentencing. On this record, the Court finds no basis for an enhancement of 12 levels for the amount of loss and four levels for the number of victims associated with the bank fraud charge. Rather, an enhancement of four levels is appropriate for the remaining $17,714.23 loss, U.S.S.G. § 2B1.1(b)(1)(C), and of two levels for the number of victims, based on more than 10, but less than 50 victims, U.S.S.G. § 2B1.1(b)(2)(A).

Accordingly, based on the Court's findings, the Adjusted Offense Level is 16, with a three-level reduction for acceptance of responsibility, § 3E1.1(a) & (b), for a total of 13. The advisory guidelines range is thus 12 to 18 months, based on an Offense Level of 13, and a Criminal History

Category of I. However, defendant filed a motion for a downward departure and/or a variance, which the Court finds justified under the circumstances of this case.

### B. Departures

Defendant seeks a downward departure under U.S.S.G. § 5K2.13 on the basis of diminished capacity. For the reasons stated above and on the record, the Court finds a departure of four levels is warranted. As noted above, the Court reviewed, and has considered at length, the medical evaluations in this case. The Court has before it a comprehensive forensic psychological report by Dr. Kieliszewski, a less extensive psychiatric forensic evaluation by Dr. Lori J. Holstege, M.D., a medical report from defendant's treating physician, Dr. Norman A. Weber, D.O., and the report of Mary Clark, M.A., L.P.C., defendant's counselor. While all these reports have been helpful in assessing the circumstances of this case, the Court has particularly relied on the evaluation and report by Dr. Kieliszewski.

It should be noted that Dr. Kieliszewski concludes that defendant suffered from diminished capacity around the time of many of her alleged criminal offenses. Dr. Holstege concludes to the contrary that defendant did not suffer from a mental disease or defect that rendered her incapable of understanding the nature or consequences of her actions, i.e., diminished capacity. However, in relying on the report and conclusion of Dr. Kieliszewski, the Court notes two important considerations. First, Dr. Holstege does not disagree with Dr. Kieliszewski with regard to key circumstances in this case. Dr. Holstege concludes that defendant suffered from Amphetamine Intoxication and abuse, but that despite her addiction, she did maintain knowledge of right and wrong. She concludes that defendant voluntarily took and continued these drugs from August 2002 to December 25, 2003. However, the Court finds Dr. Kieliszewski's report far more comprehensive,

and the depth of the analysis is such that it leaves no doubt that defendant suffered diminished capacity as a result of taking drugs prescribed by a physician.

There is no dispute that defendant was prescribed an extensive regimen of prescription drugs. The record does not permit any realistic determination of the specific times when defendant was heavily medicated. However, in preparing his report, Dr. Kieliszewski reviewed underlying records and other documentation, conducted clinical interviews with defendant, and undertook a number of other reviews and consultations pertaining to defendant's medical history and status, and her criminal case.

It is quite clear from Dr. Kieliszewski's thorough and extensive report that the medication regimen that Dr. Probes had defendant on during the time at issue in the criminal charges, resulted in psychosis and mania. Dr. Dr. Kieliszewski states in his report:

> Therefore, overall, it appears many of the instances of alleged criminal behavior were done during a time [defendant] was experiencing mental status impairment to the level that would suggest she did not understand the nature and consequences of her actions, and therefore met the statutory definition of insanity.[1]
> * * *
> I opine [defendant] did not understand the nature and consequence of her actions involved in many of the alleged incidents of criminal behavior and met the clinical threshold to suggest insanity at the time of the alleged offense.
> * * *
> [H]er mental state during the time of the alleged offense was significantly impaired to the point where she was experiencing a psychosis of thought process and thought content. There was also relevant amnesia tied to many of her behaviors at this time. . . . [H]er mental status was impaired due to the effects of increased doses of opiate pain medications and benzodiazepines. [She] was receiving maximum doses of narcotic medications while simultaneously receiving maximum doses of benzodiazepines. The particular combination could easily manifest in a drug-induced psychosis, extreme, sedation, and amnesia. At the same time , [she] was

---

[1] Providing evidence that defendant's plea-based waiver of an insanity defense represented a substantial benefit to the government and strong consideration for the government's dismissal of the bank fraud charge.

13

>      treated with extremely high doses of a stimulant medication (Ritalin). . . . As a result, [defendant] presented as extremely impaired, irrational, hyperactive, and realized spotty memories if not amnesia for her behavior at the time of the alleged offense.

(Dr. Kieliszewski Psychological Evaluation, 17-19.)

Dr. Kieliszewski's report is comprehensive in its examination of defendant and her condition at the time of the criminal activities at issue. And while the government has argued that intermittent periods of lucid behavior by defendant militate against a finding of diminished capacity, the Court notes that the evidence provides no basis for pinpointing any such periods for purposes of criminal liability.

The Court finds that Dr. Kieliszewski provides a well-reasoned basis for his conclusion that defendant suffered from diminished capacity, thereby warranting a downward departure in sentencing. But the Court also notes that there was other evidence in the record that likewise supports the Court's conclusion, including a witness statement from the citizen/victim who had various contacts with defendant after defendant switched her mail, and numerous letters from relatives and others who had personal contact with defendant. Also significant are the references by Dr. Probes himself regarding his concern about defendant's mental state during the course of his treatment of her.

The Court also concurs with Dr. Kieliszewski's view that defendant's use of the prescribed drugs was not "voluntary" to the extent that it would be considered voluntary drug use or abuse and thereby exempt from consideration as indicated under the application notes for diminished capacity. Given the extensive evidence of defendant's diminished capacity, the Court concludes that defendant is entitled to a four-level departure on the basis of diminished capacity under U.S.S.G. 5K2.13.

This departure is warranted not only by the extraordinary medical circumstances involving the prescribed medications, but also by the difficulty of showing any particular period when defendant was not suffering from diminished capacity as a result of the prescribed drugs.[2] Given the Court's finding that a four-level departure is warranted under the Guidelines for diminished capacity, the resulting Offense Level is 9, which with a Criminal History Category of I results in an advisory guidelines range of four to ten months imprisonment.

### C. Variance

Having determined the appropriate Guidelines range, the Court must as a final matter take into consideration the § 3553(a) factors in imposing sentence. Considering the extraordinary circumstances of this case, the Court concludes that § 3553(a) supports a variance from the advisory guidelines range of four to ten months imprisonment. After reading the numerous letters submitted to the Court attesting to the extenuating circumstances in this case, hearing from others involved, including defendant and a key victim in this case, Strabbing, the Court determines that incarceration in this case serves no valid purpose. The Court concludes that the advisory guidelines range is greater than necessary to accomplish the goals of sentencing in this case.

The § 3553(a) factors include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed –

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

---

[2] Further, any argument by the government that defendant's use of the prescribed drugs was excessive or not in accordance with her doctor's orders fails for the reason that it cannot be shown that the over-medication, if any, was not a result of the drug regimen itself.

        (B) to afford adequate deterrence to criminal conduct;

        (C) to protect the public from further crimes of the defendant; and

        (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)   the kinds of sentences available;

(4)   . . . the [Guidelines] sentencing range . . .;

(5)   any pertinent policy statement issued by the Sentencing Commission . . .;

(6)   the need to avoid unwarranted sentence disparities . . .; and

(7)   the need to provide restitution to any victims of the offense. [18 U.S.C. § 3553(a)]

With respect to the nature and circumstances of the offense, § 3553(a)(1), the Court considers that although losses of approximately $200,000 are certainly serious, the amount in relative terms is not overly significant, particularly given the numbers of cases of financial fraud in this Court with losses involving millions of dollars. While the Court is aware of the hardships posed by any individual losses, that consideration must be joined in context with the factors the Court is obligated to consider.

The Court must also consider the history and characteristics of the offender, which in this case are truly extraordinary. Defendant has a total lack of criminal history. She is extremely well-educated, and from all accounts, a good mother. She apparently led an exemplary life up until her encounter with increasingly serious medical problems and a pain treatment regimen involving a host of prescription drugs. From all evidence before the Court, defendant's difficulties began with her ankle injury and her gastric bypass surgery. One medical problem led to another, compounding the problems as well as the resolution.

According to Dr. Weber's medical report (Weber 6/3/08 Rep. ¶ 1), plaintiff has had nine arthroplasties on her left ankle, and it is now only marginally stable. It continues to be a significant source of pain. In November 2007, defendant had her artificial ankle removed and a cadaver ankle implanted (PSR ¶ 53). She has limited mobility and is ambulatory with the assistance of a scooter for her left leg, but her prognosis is unknown at this time (*id.*). Repeated infections, hardware removal, and wound debridement created increasing pain for defendant (Weber Rep. p. 1). The healing of her last surgery in November 2007 was complicated by her severe anemia and anxiety (*id.*). She remains under close medical supervision and is undergoing extensive testing at a cancer and hematology center (PSR ¶ 53). There is a strong potential for a tenth surgery on her left ankle (Weber Rep. ¶ 1).

Defendant also has other serious medical problems. Defendant has malabsorption problems stemming from her gastric bypass surgery eight years ago (*id.* ¶ 2). This has affected defendant's daily routine of eating, among other things. Defendant must eat frequent and smaller food portions to avoid a "dumping syndrome"; "her meal portions cannot have the usual amount of sugars or fats, otherwise severe abdominal pain and diarrhea will result from massive malabsorption of partially-digested food" (*id.*).

Defendant's condition is further aggravated by anemia, which has resulted in significant dysfunctional uterine bleeding (*id.* p. 2, ¶ 2). Defendant has received significant counseling from Ms. Clark and the prognosis for continued improvement of her mental health status appears good (*id.* ¶ 4). Defendant had severe peridontal disease, which required the extraction of all of her teeth (*id.* p. 2; PSR ¶ 53). Radiographic studies by her dentist confirmed the severity of decay in all her remaining teeth (Weber Rep. p. 1). She has tested positive for tuberculosis (PSR ¶ 54). In all

frankness, it is difficult to conceive of the breadth and extent of such varied medical problems occurring in one individual in the course of a few years.

In terms of defendant's history, the Court cannot disregard Dr. Probes prescription of a host of medications to defendant, even in the face of her deteriorating mental health. And as discussed above, the Court has given due consideration to the forsensic evaluations by Dr. Holstege and Dr. Kieliszewski, both of which were premised on similar base information, but reached different conclusions regarding defendant's medical status at the time of her criminal activity.

With regard to the need for the sentence imposed, § 3553(a)(2), the Court has considered the impact of defendant's actions, both on the individual victims and on society in general. The Court has reviewed the numerous supportive letters on behalf of defendant, particularly from her family. The Court has also listened carefully to the statement of Ms. Strabbing, who was directly impacted by her association with defendant in a failed business venture. It goes without saying that there have been many victims in this case, in varying degrees, and the Court is mindful that punishment is an issue.

Nonetheless, with regard to deterrence, the circumstances of this case do not reflect a grave danger to the public in relative terms or a need to protect the public from further crimes. This is therefore not a significant factor in this case. It is highly unlikely that defendant will commit further crimes. In the Court's view, deterrence is not the critical issue with regard to sentencing, nor is the need to promote respect for the law. Defendant's life before this aberrant behavior reflects a strong respect for the law.

But a critically important factor in this case is the final factor under § 3553(a)(2) "to provide the defendant with needed educational or vocational training, medical care, or other correctional

18

treatment in the most effective manner." Given defendant's serious and numerous medical and mental health issues, incarceration seems the least appropriate sentence. Not only is there a question whether the Bureau of Prisons system could adequately address or accommodate the multiple medical issues surrounding defendant's care, but there is also an issue whether the expense of addressing these medical needs should be born by the public by a term of imprisonment. There is no question that defendant requires significant medical care at this point, necessitating special accommodation and cost. It would not only burden the public, but advance no useful purpose in achieving the specific goals of sentencing.

Although the Court did not apply a departure on this ground, § 5H1.4 of the Guidelines permits a downward departure for physical condition of the defendant, e.g. in the case of a seriously infirm defendant such that imprisonment may be costly. *United States v Johnson, M.D.,* 71 F.3d 539, 544-545 (6th Cir. 1995). In this case, as noted in the PSR, § 94, defendant's lengthy medical history is well-documented. Her physical impairments exist to an extraordinary degree, and would therefore warrant a downward departure under § 5H1.4.

## IV.  Conclusion

The Court is mindful of the burdens on the victims in this case from a chain of events that likely could not have been envisioned with respect to someone whose life was lived out in the community mainstream for many years. In imposing sentence, however, the Court must reach a reasoned decision that considers the statutory factors. The path to this decision must balance hindsight with foresight. As noted in the PSR:

> The defendant's involvement in the instant offenses corresponds with the deterioration in her physical and mental health. She has otherwise been a contributing citizen with no prior criminal history. Her physical problems are ongoing, however, the defendant's mental health has significantly improved having

>    eliminated many of her prescriptions and sought therapy and support. She has
>    resumed her family responsibilities to the extent possible and has overwhelming
>    family support.

(PSR p. 22)

Considering the extraordinary circumstances of this case, incarceration would be counter-productive. The Court therefore determines that a variance from the advisory guidelines range is warranted.

Accordingly, for the reasons stated above and on the record at the June 12, 2008 sentencing hearing, the Court determines that a sentence of five years' probation is sufficient, but not greater than necessary to advance the goals of sentencing under § 3553(a)(2). Defendant is ordered to pay restitution of $210,227.06 and a special assessment of $200.00. Other conditions appear in the accompanying judgment of sentence.[3]

Date: June 24, 2008.                                /s/ Janet T. Neff
                                                    JANET T. NEFF
                                                    United States District Judge

---

[3] The Court notes that it would reach the same result and impose the same sentence even had the Court sustained defendant's objections to the scoring under § 2B1.1(b)(2)(B) and § 2B1.1(b)(1)(G) of the Guidelines, and had the Court not departed downward on the basis of diminished capacity under § 5K2.13. The required consideration of the factors under § 3553(a) in and of themselves convince the Court that a sentence of incarceration is unwarranted in this case.